Victor Sandoval (California Bar No. 344461)
ALMEIDA LAW GROUP LLC
3415 S. Sepulveda Blvd Suite 1121,
Los Angeles, CA 90034
562-534-5907
victor@almeidalawgroup.com

*Attorney for Plaintiffs & the Putative Classes*
*[Additional attorney on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| JOHN AVOTS-SMITH, DANIELLE KARAMANIAN-GLEBA, *and* NICOLE DANTZIC*, individually and on behalf of all oth[er] similarly situated*,<br><br>    Plaintiffs,<br><br>    vs.<br><br>NORTH BEAM, INC.,<br><br>    Defendant. | Case No.:<br>**CLASS ACTION COMPLAINT**<br>  1.  INVASION OF PRIVACY, CAL. CONST. ART. 1 §1.,<br>  2.  INTRUSION ON SECLUSION<br>  3.  VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631;<br>  4.  VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CA PENAL CODE § 632;<br>  5.  VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY AC 18 U.S.C. § 2510, ET SEQ.;<br>  6.  UNJUST ENRICHMENT<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs John Avots-Smith, Danielle Karamanian-Gleba, and Nicole Dantzic ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated, allege the following complaints against North Beam, Inc.:

## I. INTRODUCTION

1.    Americans do not expect that the products they research, the purchases they make, the health conditions they explore, and the many other sensitive aspects of their online activities will be secretly intercepted by third-party surveillance companies and used to track, profile, and target them across the internet. Yet Defendant North Beam, Inc. ("Northbeam") engages in and profits from precisely such conduct.

2.    Operating a sophisticated device graph and pixel tracking system deployed across more than 1,400 websites, Northbeam intercepts the contents of users' communications with online retailers, direct-to-consumer brands, and healthcare platforms alike, identifying individuals and compiling detailed profiles about them without their knowledge or consent.

3.    Among the most appalling applications of Northbeam's surveillance infrastructure is its deployment on telehealth websites, where Americans seeking treatment for weight management, hormone therapy, mental health, and other sensitive conditions have their medical histories, body statistics, and treatment goals captured and linked to persistent identity profiles.

4.    As a marketing intelligence and attribution platform, Northbeam captures, stores, and monetizes the data it intercepts. The information collected through Northbeam's pixel, including page views, form inputs, click activity, purchase details, and health information, is fed into Northbeam's proprietary "Device Graph," which resolves the identities of individual consumers and tracks them across the internet. Northbeam then shares this identity-resolved data with advertising platforms including Meta, TikTok, Snapchat, and Pinterest through its "Northbeam Apex" product, enabling those platforms to target advertisements to consumers based on their intercepted browsing and purchasing activity.

5.    Northbeam uses its proprietary "Device Graph" to resolve these intercepted communications to the real-world identities of individuals, enabling persistent cross-device tracking

and surveillance regardless of whether the user is purchasing cookware, researching supplements, or seeking treatment for a medical condition.

6.      Northbeam's business involves the deployment of tracking codes on websites that automatically capture sensitive information communicated by users—including URLs revealing medical conditions being researched, form inputs containing health information, and products added to a cart or purchased—and transmit that information to Northbeam's servers. Northbeam's Device Graph then links this intercepted information across devices and sessions, creating a persistent identity profile that allows Northbeam and its customers to track and target individuals based on their browsing activity, purchasing behavior, and personal characteristics.

7.      Northbeam markets its ability to provide "the most accurate marketing data available" through "device graph modeling" that creates an in-depth profile of consumers across multiple channels.[1]

8.      Northbeam captures user information for the purposes of creating individually identifiable profiles of website users without their knowledge. This identity-resolved data is shared directly with major advertising platforms including Meta, TikTok, Snapchat, and Pinterest, enabling these platforms to target advertising to individuals based on their sensitive personal information, browsing behavior, and purchasing activity.[2]

9.      All of this is done without consumers' consent or awareness. The breadth and sophistication of Northbeam's tracking technology prevents typical consumers from knowing that Northbeam is intercepting and using their sensitive communications for commercial purposes. Consumers do not consent to having their personal information intercepted by a third-party marketing surveillance company merely by browsing a website, making a purchase, or seeking medical care online.

---

[1] *About Us*, https://web.archive.org/web/20260104183242/https://www.northbeam.io/about-us (last visited April. 13, 2026).

[2] *Northbeam Apex*, https://web.archive.org/web/20250208003427/https://www.northbeam.io/integrations (last visited April. 13, 2026).

10. Plaintiffs are individuals whose electronic communications with websites in Northbeam's tracking network were intercepted by Northbeam's tracking code without their knowledge or consent. Plaintiff John Avots-Smith visited the telehealth website joinfridays.com; Plaintiff Danielle Karamanian-Gleba visited the e-commerce website jonesroadbeauty.com; and Plaintiff Nicole Dantzic visited the e-commerce website glossier.com. On information and belief, each Plaintiff also visited other websites in Northbeam's network of over 1,400 tracked domains, and Northbeam intercepted their communications on those websites as well, linking each interaction to the same persistent identity profile. In each instance, the Northbeam tracking code was actively deployed on the website and intercepted Plaintiffs' personal information—including names, email addresses, browsing activity, quiz responses, and purchase and transaction details—and transmitted that information to Northbeam's servers, where it was linked to persistent identity profiles through Northbeam's Device Graph. As more fully described below, none of the Plaintiffs were aware of Northbeam's presence on these websites, and none consented to the interception of their communications.

11. Plaintiffs bring this action to enforce their fundamental rights to privacy, seek redress and compensation for the financial, dignitary, and relational harms Northbeam has caused, and obtain a ruling that Northbeam's conduct is unlawful and must stop.

12. Plaintiffs bring this action on behalf of themselves and the putative Classes defined below to secure redress for: (i) invasion of privacy under the California Constitution, Art. I, § 1; (ii) violations of the California Invasion of Privacy Act, Cal. Penal Code § 631; (iii) violations of the California Invasion of Privacy Act, Cal. Penal Code § 632; (iv) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.; and (v) Unjust Enrichment.

## II. PARTIES

13. Plaintiff John Avots-Smith is, and at all relevant times has been, a resident of Oakland, California.

14. Plaintiff Danielle Karamanian-Gleba is, and at all relevant times has been, a resident of Randolph, Massachusetts.

15.    Plaintiff Nicole Dantzic is, and at all relevant times has been, a resident of Kirksville, Missouri.

16.    Defendant Northbeam, Inc. is a corporation incorporated under the laws of Delaware with a principal place of business located at 222 North Pacific Hwy, Suite 2000, El Segundo, CA, 90245.

### III. JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1331, because it arises under the laws of the United States, and under 28 U.S.C. § 1367, because Plaintiffs' nonfederal claims share a common nucleus of operative fact with their federal claims.

18.    This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1332(d), because it is a putative class action in which at least one member of the putative classes is a citizen of a different state than Northbeam, and in which the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.

19.    This Court has personal jurisdiction over Northbeam because Northbeam is at home in California, with its principal place of business in El Segundo, California, and because the claims arise from Northbeam's conduct in California.

20.    Venue lies in this District under 28 U.S.C. § 1391(b)(1) and (b)(2), because Plaintiffs and/or Class members reside in this District, because Northbeam conducts substantial business in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

21.    Pursuant to Local Rules 3.2(c) and 3.5(b), assignment to the Oakland Division is proper because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

### IV. FACTUAL BACKGROUND

**A. Northbeam Deploys Tracking Technology to Intercept and Collect Vast Amounts of Consumer Data**

22.    Northbeam was founded in 2019 and describes itself as a "marketing intelligence platform" that provides "multi-touch attribution and media mix modeling" for e-commerce and direct-to-consumer brands.[3]

23.    Northbeam has raised approximately $32.6 million in venture capital funding, including a $15 million Series A round in August 2022.[4]

24.    Northbeam's customers include major consumer brands such as Fridays, Glossier, Jones Road Beauty, Dr. Squatch, Kitsch, HexClad, The Ridge, and OSEA Malibu. Northbeam markets its ability to track consumers across the internet and identify the marketing touchpoints that lead to conversions to these customers.[5]

25.    The scale of Northbeam's surveillance operations is vast. Northbeam's tracking code is deployed on over 1,400 websites.[6] Northbeam itself reports that it serves "more than 800 brands worldwide" and tracks "over $25B in ad spend, $130B in attributed revenue and more than 2.1 trillion impressions."[7]

26.    Each of these tracked impressions and website visits generates data that flows into Northbeam's Device Graph, enabling persistent surveillance and identity resolution across millions of consumers.

---

[3] *Northbeam – The Marketing Intelligence Platform for Profitable Growth*, https://web.archive.org/web/20260106192113/https://www.northbeam.io/ (last visited April. 13, 2026).

[4] *Marketing Intelligence Platform Northbeam Raises $15 Million Series A Funding*, (Aug. 16, 2022), https://perma.cc/S6Q3-R68X (last visited April. 13, 2026); *Northbeam Funding Rounds*, https://perma.cc/X5UN-97H7 (last visited April. 13, 2026).

[5] *See, e.g.*, *Case Studies*, https://perma.cc/LY74-5QYQ (last visited Feb. 9, 2026) (listing case studies for Dr. Squatch, HexClad, Kitsch, and The Ridge as Northbeam customers). (last visited April. 13, 2026).

[6] *Wappalyzer, Find Northbeam Customers*, https://web.archive.org/web/20240422085636/https://www.wappalyzer.com/technologies/analytics/northbeam/ (last visited April. 13, 2026).

[7] *Pricing & Features*, https://perma.cc/3V4V-YCAC (last visited April 13, 2026) (citing Northbeam company statistics).

27. Northbeam's customer base includes hundreds of consumer-facing companies that collect sensitive information including AG1 (drinkag1.com), a nutritional supplement company; 310 Nutrition (310nutrition.com), a weight loss supplement provider; Omnilux (omniluxled.com), which sells FDA-cleared LED therapy devices; Thesis (takethesis.com), which markets nootropic supplements for cognitive enhancement including to consumers with attention deficit conditions; and HSAStore.com, which sells health savings account-eligible medical products.[8]

28. The data tracked across these websites is used to create a comprehensive marketing profile of the user. For example, when a user visits AG1 (drinkag1.com), Northbeam's pixel intercepts communications from consumers seeking nutritional supplements for gut health, energy, and immune support—information revealing concerns about digestive disorders, fatigue, and immune deficiencies. When the same user visits 310 Nutrition (310nutrition.com), Northbeam intercepts communications from consumers purchasing meal replacement shakes and weight loss supplements, revealing struggles with weight management and body image. Or on Thesis (takethesis.com), Northbeam intercepts communications from consumers seeking nootropic supplements marketed for focus and cognitive enhancement, including consumers who self-identify as having attention deficit conditions.

29. Northbeam captures the user's interactions with each website and appends the collected data to a persistent identity profile which matches individuals across websites either by collecting PII that a user enters on any of these websites, or by collecting a device fingerprint, which identifies users by collating IP addresses, browser identifiers, machine information, and more.

30. Northbeam also uses persistent cookies and mobile advertising IDs to identify and track users across sessions and devices. All of this data is stored in Northbeam's Device Graph.

31. Many of the telehealth platforms in Northbeam's customer base—including platforms that prescribe GLP-1 medications, provide hormone therapy, and deliver mental health services—are healthcare providers that collect individually identifiable health information subject to protection under HIPAA. *See* 42 U.S.C. § 1320d(4)–(6); 45 C.F.R. § 160.103.

---

[8] Wappalyzer, *supra* n. 6 (listing top websites using Northbeam by traffic).

32. When consumers communicate sensitive information to these platforms, including medical histories, current medications, treatment goals, and health conditions, they do so with a reasonable expectation—reinforced by federal law—that such information will remain confidential and will not be disclosed to third parties for marketing purposes.

33. Northbeam's interception and retransmission of this data to advertising platforms through Northbeam Apex is precisely the type of unauthorized disclosure that consumers expect, and regulators require, to be prohibited.

34. However, despite these reasonable expectations and regulatory requirements, the Northbeam tracking code automatically intercepts and collects detailed information about website visitors, including:

   a. The full URLs of pages visited, which reveals sensitive information about the content being viewed;

   b. Form inputs and data entered by users, including personal and health information;

   c. User clicks on specific pages;

   d. Purchase intent signals such as adding items to cart and completing transactions;

   e. Device identifiers including cookies, mobile advertising IDs, and browser fingerprints;

   f. IP addresses and geolocation data;

   g. Precise timestamps of user activity.[9]

35. Collection of this data constitutes the interception of sensitive communications. Clicks, for example, often indicate answers to sensitive questions, especially in the context of onboarding quizzes or questionnaires. Page views often correspond to a user's condition and add-to-cart and other conversion events may reflect the purchase of a prescribed medicine.

**B. Northbeam's Device Graph Enables Cross-Device Identity Resolution**
   *i. Northbeam Identifies and Surveils Web Users Through a Multifaceted Tracking Scheme that Operates Across Many Websites*

---

[9] *Clicks + Deterministic Views (C+DV),* https://web.archive.org/web/20251217070915/https://docs.northbeam.io/docs/clicks-deterministic-views (last visited April 13, 2026)

36.    At the core of Northbeam's surveillance capabilities is its proprietary "Device Graph," which links together multiple devices and identifiers to create a unified profile of individual consumers. Northbeam describes its Device Graph as employing two complementary identity-resolution techniques (i) "deterministic"  matching, which links user activity to a known identity using exact data points such as a full name, email address, pixel IDs, or phone number; and (ii) "probabilistic" matching, which relies on statistical inference—drawing on signals like device type, IP address, and behavioral patterns—to resolve fragmented identity data into a single consumer profile.

37.    When a consumer provides an identifier—e.g., by submitting it on a form, making a purchase, or logging into an account—Northbeam's "deterministic" matching captures that data point and uses it as an anchor to link all activity associated with that identity across devices and sessions.[10]

38.    Northbeam does not require a consumer to provide their name, email address, or phone number to track them. Where such identifiers are unavailable, Northbeam uses "probabilistic matching," where Northbeam's algorithms silently analyze device characteristics (browser type, screen resolution, installed fonts, time zone), network attributes (IP address, ISP), and behavioral signals (browsing patterns, session timing) to uniquely identify site users and infer that distinct interactions across devices originate from the same person.

39.    When a consumer enters their email address on a website where Northbeam is installed, Northbeam can deterministically link that session to any other session across its network of 1,400+ websites where the same email address was provided, creating a unified view of that consumer's browsing activity across the internet.

---

[10] *See Northbeam, Probabilistic vs. Deterministic Attribution Approaches In a Cookieless Future*, https://web.archive.org/web/2026/https://www.northbeam.io/blog/probabilistic-vs-deterministic-attribution-marketing (last visited Apr. 13, 2026) (deterministic attribution "relies on exact matches between a user's actions and their identity, often through login credentials, user IDs, or hashed email addresses"); *Northbeam, Clicks + Deterministic Views (C+DV)*, *supra* n. 9 (deterministic attribution "[m]atches conversions to ads using exact identifiers (like order ID, hashed email, or phone)").

40.    This allows Northbeam to follow a consumer across their devices and platforms without their awareness. Mobile browsing, desktop activity, and connected television viewing are linked through IP addresses, device fingerprints, and behavioral patterns, assembling a cross-device profile that persists and expands over time—even for consumers who have never volunteered a single piece of identifying information.[11]

41.    Northbeam also identifies users by setting persistent cookies on visitors' browsers that store the Device Graph identifier and other tracking data. The primary tracking cookie, identified as "nb_sp_cookie," is set with a two-year expiration period, enabling Northbeam to recognize returning visitors and link their browsing sessions across extended time periods.[12]

42.    This Device Graph technology allows Northbeam to create detailed timelines of individual consumers' browsing activity across the internet, which Northbeam markets to its customers as "the most accurate marketing data available," achieved through "innovating on device graph modeling."[13]

43.    When a consumer visits a website with Northbeam code installed, Northbeam captures their device identifier and attempts to match it against its Device Graph. If a match is found, Northbeam adds the browsing activity to the consumer's existing profile. If no match is found, Northbeam creates a new profile and attempts to link it to existing profiles through probabilistic matching techniques.

ii.   *Northbeam Tracking Code Evades Privacy Controls*

44.    The Northbeam tracking code is loaded from Northbeam's servers using a unique client identifier assigned to each website operator. When a visitor loads a webpage containing the Northbeam tracking code, the JavaScript code executes in the visitor's browser and transmits

---

[11] *Id.*

[12] *Link DNS*, https://perma.cc/JF4Z-UKU5  (last visited Jan. 29, 2026) ("In your domain provider, you'll need to create an A Record, named i, pointing to a specific address you'll find in your dashboard. This allows first-party tracking.").

[13] *Privacy Policy*, https://web.archive.org/web/20260105032227/https://www.northbeam.io/privacy (last visited Jan. 30, 2026).

detailed tracking data to Northbeam's servers. Northbeam instructs website operators to host a subdomain in users' browsers that directs user data to Northbeam's servers, enabling what Northbeam describes as "first-party tracking" that avoids "many of the limitations of third-party tracking."[14]

45.    The technical infrastructure Northbeam deploys is standardized across its network of customer websites. Northbeam provides each website operator with the same JavaScript tracking code, loaded from the same "j.northbeam.io" endpoint, differentiated only by a unique client identifier assigned to each merchant. Each deployment of the first-party pixel uses the same Snowplow Analytics-based data collection framework, sets the same "nb_sp_cookie" with a two-year expiration period, transmits the same structured data payloads containing the "duid," "sid," "vid," and "aid" parameters, and routes collected data to a collector endpoint configured through the same first-party DNS subdomain technique described above. The technical analysis of the Northbeam tracking code on joinfridays.com is therefore illustrative of how the Northbeam tracking code operates on all websites across Northbeam's network, including jonesroadbeauty.com and glossier.com.

46.    Although routed through a subdomain bearing the website operator's domain name, the user's data is transmitted directly from the user's browser to Northbeam's servers—the website operator never receives, processes, or stores the communication before Northbeam acquires it. This is a necessary consequence of the subdomain configuration Northbeam requires: the subdomain's DNS record points directly to Northbeam's server IP address, meaning that HTTP requests sent to that subdomain are routed by the internet's domain name system to Northbeam, not to the website operator's own servers.[15]

47.    Northbeam's first-party subdomain configuration is specifically designed to circumvent browser privacy protections that would otherwise limit third-party tracking. By instructing website operators to create subdomains that appear to belong to the website operator but

---

[14] *Id.*

[15] *Northbeam's Data Sources*, https://docs.northbeam.io/docs/northbeam-data-sources (last visited Apr. 10, 2026).

actually route data directly to Northbeam's servers, Northbeam disguises its third-party data collection as first-party activity.

48. The disguise also defeats browser-based privacy protections, ad blockers, tracker blocklists, and other privacy tools that consumers have affirmatively installed to protect themselves. Most such tools operate by blocking requests to known tracking domains, but when tracking requests appear to originate from the merchant's own domain, those protections are ineffective.

49. Even a consumer inspecting their browser's network activity would observe requests only to the website they are visiting, with no visible indication that their data is actually being routed to a third-party surveillance company.

50. Northbeam uses their tracking code as a window into unsuspecting website visitor's activity, operating as a means of continuous surveillance to create a record that Northbeam ultimately monetizes through its attribution platform and Apex integrations.

iii. *Northbeam's Tracking Technology Intercepts and Records Data From Users Across the Web*

51. Each tracking request transmitted by the Northbeam tracking code contains a structured data payload that includes multiple user identifiers and contextual information. The payload typically includes: (a) a "duid" or "domain user ID" parameter containing a persistent unique identifier in UUID format that serves as the user's Device Graph identifier and links their activity across browsing sessions; (b) a "sid" or session identifier tracking the user's current browsing session; (c) a "vid" or visit counter recording the cumulative number of times the user has visited the website; (d) an "aid" or application identifier that identifies which Northbeam customer deployed the tracking code; and (e) detailed contextual information including the full URL being visited, referrer information, browser characteristics, screen resolution, time zone, and language settings.

52. The screenshot below illustrates the construction of the Northbeam tracking code on the consumer website "timex.com," a consumer website As the code below shows, the Northbeam tracking code captures the user's name and email, along with the name of the product purchasded, whether the purchase is recurring, whether the user entered a discoun code, and other data about the user's interaction with the website.

```
        payload: e
}), "v1");
snowplow("trackStructEvent:nb", "__nb_internal", "petmeds-firePurchaseEvent", JSON.stringify({
    order_id: t,
    customer_id: e.customerId,
    time_of_purchase: e.timeOfPurchase,
    customer_email: e.customerEmail,
    customer_phone_number: e.customerPhoneNumber,
    customer_name: e.customerName,
    discount_codes: s.split(","),
    discount_amount: e.discountAmount,
    order_tags: e.orderTags,
    tax: o,
    is_recurring_order: e.isRecurringOrder,
    currency: n,
    purchase_total: i,
    products: r.map((function(e) {
        return {
            id: e.productId,
            name: e.productName,
            quantity: e.quantity,
            price: e.price,
            variant_id: e.variantId,
            variant_name: e.variantName
        }
    }
```

```
function init(config, bundle) {
    clientConfig = config;
    var FinalizedNorthbeam = {
        identify: identify,
        identifyCustomerId: identifyCustomerId,
        trackPageView: trackPageView,
        fireEmailCaptureEvent: fireEmailCaptureEvent,
        fireCustomGoal: fireCustomGoal,
        firePurchaseEvent: firePurchaseEvent,
        firePurchaseSyncEvent: firePurchaseSyncEvent,
        fireSlimPurchaseEvent: fireSlimPurchaseEvent,
        version: "v1"
    }
    , context = __assign(__assign({
        jQuery: jQuery,
        snowplow: snowplow,
        createProductId: createProductId,
        drainNBQ: drainNBQ,
        config: config,
        attachDefaultShopifyAccountSignupListener: attachDefaultShopifyAccountSignupListener,
        attachEmailCaptureListener: attachEmailCaptureListener,
        fireMetaAnalyticsEvent: fireMetaAnalyticsEvent,
        initialize: initialize
    }, FinalizedNorthbeam), {
        utils: {
            validateEmail: validateEmail
```

53. The data captured through its tracking code will often, as seen above, include highly sensitive personally identifiable information. The foregoing screenshots show that the Northbeam tracking code captures form-entry data including the user's first name and last name (the "customer_name" parameter) and email address (the "customer_email" parameter), along with information about his or her purchase ("firePurchaseEvent", "is_recurring_order", "purchase_total", and other paramaters).

54.    Defendant's product is designed to individually identify consumers using such immutable identifiers as email, phone number, and name. Defendant may also capture categorical flags indicating which medical treatments the user is seeking. For example, on the joinfridays.com website. Northebeam captures data related to sensitive user inputs including "tag_weight-loss," "tag_testosterone," "tag_hair-growth," "tag_longevity," and "tag_microdose"—thereby revealing the user's confidential health conditions and treatment interests.

```
EVERFLOW:\"everflow\",GOOGLE_TAG_MANAGER:\"google-tag-manager\",KATALYS:\"katalys\",NORTHBEAM:\"northbeam\",
QUORA:\"quora\",TATARI:\"tatari\"},u1={EVERFLOW_ORDER_ID:\"oid\",EVERFLOW_AFFILIATE_ID:\"affid\",
CUSTOMER_IO_ID:\"cio_id\",UTM_CAMPAIGN:\"utm_campaign\",UTM_SOURCE:\"utm_source\"},To=
{EMAIL_SUBMITTED:\"emailSubmitted\",SMS_SUBMITTED:\"smsSubmitted\",PRODUCT_ITEM_CLICKED:\"productItemClicked\",
PRICES_SELECTED:\"pricesSelected\",CHECKOUT_PAGE_VIEWED:\"checkoutPageViewed\",
SHOP_PAGE_VIEWED:\"shopPageViewed\",SHOP_SUMMARY_PAGE_VIEWED:\"shopSummaryPageViewed\",
REFERRAL_SUBMITTED:\"referralSubmitted\",PAYMENT_FAILED:\"paymentFailed\",PAYMENT_COMPLETED:\"paymentCompleted\",
USER_SIGNED_UP:\"userSignedUp\",USER_LOGGED_IN:\"userLoggedIn\",USER_LOGGED_OUT:\"userLoggedOut\",
USER_PROFILE_UPDATED:\"userProfileUpdated\",PAYMENT_REDIRECT:\"paymentRedirect\"},Mp={[Ct.WEIGHT_LOSS]:Ct.
WEIGHT_LOSS,[Ct.HAIR_GROWTH]:Ct.HAIR_GROWTH,[Ct.LONGEVITY]:Ct.LONGEVITY,[Ct.MICRODOSING]:\"microdose\",[Ct.
TESTOSTERONE]:\"trt\"},m4={PURCHASE:\"purchase\",ADD_TO_CART:\"add_to_cart\",
COMPLETE_REGISTRATION:\"complete_registration\",BEGIN_CHECKOUT:\"begin_checkout\",
ADD_PAYMENT_INFO:\"add_payment_info\",USER_DATA:\"user_data_collected\"},tF={PURCHASE:\"Purchase\",
ADD_TO_CART:\"AddToCart\",ADD_PAYMENT_INFO:\"AddPaymentInfo\"},l7t={PURCHASE:\"Purchase\"},Rhe={ADD_TO_CART:1,
INITIATE_CHECKOUT:2},c7t={EMAIL_CAPTURE:\"email-capture\"},u7t={CONVERT:\"convert\"},nF={VIEW:\"VIEW_EVENT\",
PRE_CHECKOUT:\"PRE_CHECKOUT\",LEAD:\"LEAD\"},rF=async e=>{await pi.post(\"/events\",e)},d7t=async({userCode:e,
```

55.    In addition to capturing page views and form data, Northbeam's tracking code is designed to capture and record user clicks. Northbeam's own technical documentation describes its "Clicks + Deterministic Views" attribution model, which captures both "clicks" and "views" to track user interactions with websites. User click tracking also transmits sensitive data: In the context of a healthcare intake quiz, for example, where users answer sensitive medical questions by clicking on response options, Northbeam's click tracking functionality captures and transmits the substance of users' responses to those questions. Click tracking may also be used to track a user's purchases, cart additions, and other data that communicates a user's browsing and purchase habits, among other sensitive information. As shown in the source code, the Northbeam tracking code records click events alongside the unique identifiers listed above (i.e., "duid"), supplying Northbeam with a recording of a user's

actions on a specific page—frequently including the user's selection of quiz answers, product selections, and other potentially sensitive communications.

56. Northbeam captures this sensitive data through its proprietary JavaScript code, which executes in the user's browser and transmits their communications to Defendant's collector endpoint—for example, at "i.joinfridays.com/nb-collector"—contemporaneously with the user's intended communication with the website. As the user submits form data or clicks on a page element, the Northbeam tracking code simultaneously captures and redirects that data to Northbeam's collector endpoint in real time, before the website operator receives, processes, or stores it.

57. The technical infrastructure Northbeam deploys is standardized across its network of customer websites. Northbeam provides each website operator with the same JavaScript tracking code, loaded from the same "j.northbeam.io" endpoint, differentiated only by a unique client identifier assigned to each merchant. Each deployment uses the same Snowplow Analytics-based data collection framework, sets the same "_nb_sp_cookie" with a two-year expiration period, transmits the same structured data payloads containing the "duid," "sid," "vid," and "aid" parameters, and routes collected data to a collector endpoint configured through the same first-party DNS subdomain technique described above. The technical analysis of the Northbeam tracking code on joinfridays.com is therefore illustrative of how the Northbeam tracking code operates on all websites across Northbeam's network, including jonesroadbeauty.com and glossier.com.

58. Neither the third parties listed above nor, on information and belief, any third-party website that uses Northbeam, discloses Northbeam's cross-device identity resolution, data aggregation, or information sharing with advertising platforms through Northbeam Apex.

59. Users who visited these websites, or any website where Northbeam was active, and entered their personal and financial information were therefore unaware that their communications were being simultaneously intercepted and transmitted to Northbeam's servers.

**C. Northbeam Is a Third-Party Eavesdropper, Not an Extension of Website Operators**

60.    Northbeam is not a mere extension or agent of the website operators who deploy its tracking code, but an independent third-party eavesdropper with its own commercial interests in the data it intercepts. Unlike a simple analytics tool that processes data solely for the benefit of a single website operator, Northbeam aggregates and links user data across its entire network of client websites through its Device Graph.

61.    When a consumer visits joinfridays.com, for example, Northbeam does not merely analyze that interaction for joinfridays.com's benefit but links that interaction to the consumer's browsing history on every other Northbeam-tracked website, creating a unified identity profile that no individual website operator could construct and that serves Northbeam's independent commercial interest in building a comprehensive surveillance infrastructure.

62.    Northbeam's Apex platform further demonstrates that Northbeam uses intercepted consumer data for purposes independent of serving individual website operators. Through Apex, Northbeam transmits consumer data directly to Meta, TikTok, Snapchat, and Pinterest, among other advertising platforms pursuant to commercial partnerships Northbeam has established with these advertising platforms.[16][17]

63.    These partnerships serve Northbeam's independent business interests—enhancing its product offering, strengthening its market position, and generating value through data sharing arrangements—not merely the interests of the website operators whose users' data is transmitted. A website operator deploying Northbeam's pixel does not control, and may not even be aware of, the data flows from Northbeam to advertising platforms through Apex.

---

[16] *Northbeam Launches Industry-First Attribution Model That Connects Ad Views and Clicks Across Platforms to Real Revenue*, BusinessWire (Oct. 7, 2025), https://www.businesswire.com/news/home/20251007146281/en/ (Northbeam announcing solution "developed in direct partnership with Meta, TikTok, Snapchat, Pinterest, Axon, MNTN, and Vibe").

[17]*Apex Technical Guide*, *supra* n. 9.

64. Website operators deploying Northbeam's tracking code do not exercise meaningful control over Northbeam's collection, retention, and use of the data Northbeam intercepts. Northbeam independently determines: (a) the technical specifications of its tracking code and what data it captures; (b) how long intercepted data is retained in Northbeam's systems; (c) how the Device Graph links users across Northbeam's client network; (d) which advertising platforms receive data through Apex integrations; and (e) what security measures protect intercepted data.[18]

65. Northbeam also derives independent commercial benefit from the data it intercepts beyond providing services to individual website operators. Northbeam's Device Graph—which constitutes its core competitive advantage and primary value proposition—is built from aggregated consumer data collected across all of Northbeam's client websites.

66. Each consumer interaction Northbeam intercepts enhances the accuracy and comprehensiveness of the Device Graph, increasing Northbeam's ability to resolve identities, improving its attribution models, and enabling Northbeam to charge premium prices for its services. This accumulation of data assets for Northbeam's independent commercial benefit distinguishes Northbeam from a mere analytics tool operating solely for the benefit of website operators.

67. Northbeam's own Data Processing Addendum confirms it processes "Personal Data pertaining to data subjects' use of and interaction with Customer's websites or other online services," and identifies the data subjects as "[u]sers of Customer's websites or other online services"— i.e., the very consumers whose communications Northbeam's pixel intercepts. Northbeam's designation of itself as a "Processor" of personal data, and its contractual commitments regarding "Customer Personal Data," confirm that Northbeam does not act as an extension of website operators with respect to the data flowing through Northbeam's pixel. [19]

68. Additionally, Northbeam's "Enhanced Apex" feature shares order-level data, including what products were purchased, transaction amounts, and associated customer identifiers. Northbeam's documentation states that "[b]y turning on Enhanced Apex now, Northbeam can begin

---

[18] *Id.*

[19] *Data Processing Addendum*, https://perma.cc/YEC6-RQLQ (last visited April. 13, 2026).

sharing order-level data with Meta" and that "[t]his data currently supports Meta model training." Northbeam offers a premium market research product in exchange for the opportunity to capture user data from partner websites, thereby receiving a direct commercial benefit from their interceptions.[20]

69.    Finally, Northbeam describes its business model in terms that leave no ambiguity about the commercial value it derives from intercepted consumer data. In a recent job listing, Northbeam stated: "We don't sell shoes, ads, or games. We sell data: quality integrations with a variety of platforms, fresh reliable data pulls, correct aggregations and algorithmic insights on top of that data, all packaged up in a user-facing application."[21]

70.    Northbeam elsewhere describes its competitive advantage as rooted in "[o]ur unique combination of high-quality partner integrations, rich 1st-party data, and a robust identity graph" that "gives us an advantage that is extremely difficult for competitors to replicate."[22]

71.    These statements confirm that Northbeam's Identity Graph—built from data intercepted through its tracking pixel deployed across hundreds of websites—is not a byproduct of its analytics services but the core commercial asset of the company.

**D. Northbeam Shares Consumer Data with Advertising Platforms**

72.    Northbeam's "Northbeam Apex" product, announced in August 2024, directly integrates with major advertising platforms including Meta and Axon. [23] Through Northbeam Apex,

---

[20] *Northbeam Apex, supra* n. 2.

[21] *Staff Software Engineer, Data Science*, Northbeam job listing, BuiltIn, https://perma.cc/AA24-93SK (last visited April. 13, 2026).

[22] *See Director, Data Science*, Northbeam job listing, LinkedIn, https://perma.cc/CX6S-AXBW (last visited April. 13, 2026).

[23] *Northbeam Announces Apex, New Integration with Meta to Improve Ad Performance*, BusinessWire (Aug. 14, 2024), https://www.businesswire.com/news/home/20240814907548/en/Northbeam-Announces-Apex-New-Integration-with-Meta-to-Improve-Ad-Performance  (last visited April 27, 2026).

Northbeam transmits consumer data—including identity-resolved browsing activity from its Device Graph—directly to these advertising platforms to enable targeted advertising.[24]

73.    Northbeam describes Northbeam Apex as "a direct integration between Northbeam and [its] advertising platform partners to optimize ad performance using Northbeam data," through which "participating platform partners (including Meta) can integrate first-party, multi-touch performance signals into their algorithm's optimization process." This means that sensitive information intercepted by Northbeam's tracking code, including health information from telehealth websites, is transmitted directly to advertising giants for use in targeting advertisements to consumers.[25]

74.    Through Northbeam Apex and related attribution tools, Northbeam transmits first-party, multi-touch performance signals and behavioral data collected from consumer websites to advertising-platform partners for use in algorithmic ad optimization. Northbeam represents that participating partners, including Meta, can integrate those signals into their optimization process, and that Northbeam's pixel collects behavioral data such as marketing touchpoints and pages visited for inclusion in Northbeam's device graph. Likewise, TikTok—one of the advertising platforms to which Northbeam transmits intercepted consumer data through Apex—states that event data transmitted through its Events API and related tools may be used for measurement, optimization, targeting, and audience building, confirming that data Northbeam sends to TikTok is used by TikTok for its own commercial advertising purposes.[26]

75.    Northbeam's partnership with advertising platforms confirms that the advertising platforms are active collaborators in Northbeam's surveillance infrastructure. The platforms provide Northbeam with technical specifications for data formatting and transmission; Northbeam provides

---

[24] *Northbeam Apex*, *supra* n. 2 ("Northbeam Apex is a direct integration between Northbeam and our advertising platform partners to optimize ad performance using Northbeam data. With Apex, participating platform partners (including Meta) can integrate first-party, multi-touch performance signals into their algorithm's optimization process.").

[25] *Id.*

[26] *Id.*

the platforms with identity-resolved consumer profiles enriched with browsing and purchasing behavior from across its network. This collaboration amplifies the privacy harm to consumers, whose sensitive personal information becomes embedded in advertising systems designed to exploit that information for commercial purposes.

**E. Northbeam Never Obtained Effective Consent to their Data Gathering Practices**

76.    Northbeam conducts its surveillance practices within a context and in a manner where consent from the persons whose data it intercepts does not in fact occur, and could not be enforced as a matter of law given the lack of adequate disclosure and the extent of the privacy rights that are violated.

77.    Plaintiffs and Class members have no direct relationship with Northbeam. They do not knowingly interact with Northbeam's services or visit Northbeam's website. Northbeam's tracking code operates invisibly in the background, intercepting communications without any notice to consumers that their data is being captured by a third party.

78.    Northbeam makes no pretense of having directly obtained consent from the persons whose data it intercepts. Instead, Northbeam relies on its customers—the website operators who deploy Northbeam's tracking code—to obtain consent on Northbeam's behalf. But consumers seeking medical care through telehealth platforms reasonably expect their health information to remain confidential between themselves and their healthcare provider; they do not expect that a third-party marketing surveillance company is intercepting and collecting their most sensitive health information.

79.    Even where websites deploying Northbeam's tracking code maintain privacy policies, these disclosures do not adequately inform users that Northbeam—a third-party marketing intelligence company—is independently collecting their data and constructing persistent personal profiles through its Device Graph technology.

80.    Although individual privacy policies may generically reference the use of "analytics" or "advertising technologies," they do not, on information and belief, describe the scope of information Northbeam collects, explain that Northbeam aggregates this data across multiple

websites to create cross-device identity profiles that persist indefinitely, or specifically identify Northbeam as a recipient of user data.

81. Users who read these privacy policies are therefore unaware that their interactions are being intercepted and transmitted to Northbeam's servers, where they are linked to a unique identity profile that tracks their behavior across the internet. Additionally, most users are not provided with adequate notice of, and do not consent to, such privacy policies before Northbeam begins to intercept users' communications with website operators.

82. Northbeam itself also obtains no consent from the consumers whose data it intercepts. Northbeam has no direct relationship with website visitors and provides no notice to them that it is collecting their communications, browsing behavior, form inputs, and other sensitive information. Northbeam does not present consumers with an opportunity to opt out of its Device Graph or to prevent their data from being shared with advertising platforms through Northbeam Apex. Northbeam operates entirely in the shadows, intercepting consumer data without the knowledge or authorization of the individuals whose privacy it invades.

83. The information asymmetry between Northbeam and the consumers whose data it intercepts makes genuine consent practically unattainable, because website operators deploying Northbeam's pixel are specifically utilizing its first-party subdomain configuration to evade third-party privacy blockers and browser protections, and thus have every incentive not to fully disclose Northbeam's presence. Northbeam encourages and facilitates this non-disclosure by designing its tracking infrastructure to be invisible to consumers.

84. Northbeam possesses complete knowledge of its tracking code 's capabilities, the data it collects, how its Device Graph resolves identities, and which advertising platforms receive consumer data through Northbeam Apex. Consumers, by contrast, cannot reasonably observe Northbeam's pixel executing in their browsers, inspect the data payloads transmitted to Northbeam's servers, or discover that their sensitive personal information has been linked to a persistent identity profile and shared with Meta, TikTok, and Pinterest. This asymmetry is fundamental to Northbeam's business model. If consumers understood the scope of Northbeam's surveillance, they would refuse to visit websites deploying its tracking technology.

85. The complexity of Northbeam's technical infrastructure—involving first-party subdomain configurations designed to evade browser privacy protections, persistent cookies with two-year lifespans, deterministic and probabilistic identity matching, and real-time data sharing with multiple advertising platforms—demonstrates that Northbeam's tracking infrastructure is deliberately engineered to operate beyond the visibility of reasonable consumers and standard privacy-enhancing tools, rather than through any transparent, consent-based framework.

86. Northbeam's first-party subdomain configuration is specifically designed to disguise its third-party tracking as first-party activity, defeating browser-based privacy protections, ad blockers, and tracker blocklists that consumers have affirmatively installed to protect themselves from exactly this kind of surveillance. Consumers who take deliberate steps to block third-party tracking are thus unable to prevent Northbeam's data collection.[27]

87. Because Northbeam operates a tracking infrastructure specifically designed to evade browser-based privacy protections and disguise third-party data collection as first-party activity, Northbeam cannot credibly claim that consumers have consented to its tracking. Consumers who have taken affirmative steps to block third-party tracking have communicated a clear preference not to be tracked, yet Northbeam's architecture is engineered to circumvent those very protections by which consumers communicate their refusal to be tracked.

**F. Representative Plaintiffs' Experiences**

**A. Plaintiff John Avots-Smith**

88. As recently as June 2025, Plaintiff Avots-Smith visited the telehealth website joinfridays.com to seek treatment for weight management. Joinfridays.com is a telehealth platform that provides GLP-1 medications (such as semaglutide and tirzepatide) for weight loss[28].

---

[27] *Privacy Policy*, https://web.archive.org/web/20260105032227/https://www.northbeam.io/privacy (last visited April 13, 2026).

[28] *Frequently Asked Questions*, Fridays Health, https://www.joinfridays.com/faqs (last visited April 27, 2026) ("Fridays is a telehealth platform offering personalized medical weight loss programs using GLP-1 medications, microdosing strategies, and expert clinical support.").

89.    To determine eligibility for treatment, the website requires users to communicate detailed personal health information to it, including:

a.    Medical history, including current medications and prior health conditions;

b.    Weight, height, and body mass index (BMI) calculations;

c.    Body statistics and measurements;

d.    Weight loss goals and treatment objectives.

90.    When Plaintiff Avots-Smith visited joinfridays.com and communicated this sensitive health information, Northbeam's tracking code was present on the website and intercepted the contents of Plaintiff's communications with the website. Northbeam's Device Graph then used there intercepted information, along with other tracking data, to identify Plaintiff and associate this sensitive health information with his persistent identity profile.

91.    As configured on the joinfridays.com website, the Northbeam tracking code captured user clicks and form submissions as the user submitted them. The pixel captured full-string URLs and clicks that corresponded to sensitive information, including in this case the user's desire to purchase the "GLP-1 injectable" product from Fridays, along with his medical history and other sensitive information related to his weight and medical history.

92.    At no time did Plaintiff Avots-Smith consent to Northbeam intercepting his communications with joinfridays.com. He did not have a direct relationship with Northbeam and was unaware of Northbeam's presence on the joinfridays.com website. The joinfridays.com privacy policy did not identify Northbeam as a recipient of user data or disclose that a third-party marketing intelligence company was independently intercepting and profiling users' health information. Moreover, Northbeam's first-party subdomain configuration caused its tracking to bypass third-party cookie blockers and browser privacy protections that Plaintiff may have employed, and Northbeam does not respond to "Do Not Track" browser signals.[29] Plaintiff therefore had no means of discovering or preventing Northbeam's interception of his communications, and at no time did Plaintiff consent to Northbeam using his sensitive health information for marketing attribution,

---

[29] *Privacy Policy*, *supra* n. 13.

identity resolution, or sharing with third-party advertising platforms through Northbeam Apex or any other means.

93. Northbeam subsequently shared this health information with advertising platforms through Northbeam Apex, enabling those platforms to target advertisements to Plaintiff based on his health-seeking behavior.

94. Analysis of the joinfridays.com website confirms the presence and active operation of Northbeam's tracking infrastructure. The Northbeam tracking code on joinfridays.com loads from "j.northbeam.io/ota-sp/72a66a7e-f77f-41b5-82e1-f535dded38bf.js," where the alphanumeric string identifies Fridays Health's unique Northbeam merchant account. When users interact with the joinfridays.com website, the pixel transmits tracking data to the collector endpoint at "i.joinfridays.com/nb-collector"—a first-party subdomain configured to route tracking data through Northbeam's servers while appearing as a first-party connection to the user's browser.

95. Each tracking request transmitted from joinfridays.com to Northbeam's collector contains the user's persistent Device Graph identifier in the "duid" parameter, session identifier in the "sid" parameter, cumulative visit count in the "vid" parameter, and the full URL being visited—including URL paths and query parameters that reveal the user's progress through the medical intake process. For example, a URL such as "joinfridays.com/onboarding/weight-loss/step-3" reveals both the specific medical treatment being sought and how far the user has progressed through the intake flow. The Northbeam tracking code on joinfridays.com sets a persistent cookie named "_nb_sp_cookie" with a two-year expiration period, storing the user's Device Graph identifier and enabling Northbeam to recognize and track returning visitors across extended time periods and multiple browsing sessions.

96. The privacy violations Plaintiff Avots-Smith suffered are not confined to his visits to joinfridays.com but continue to the present day. Northbeam's Device Graph retains his identity profile, which remains linked (through the deterministic and probabilistic matching techniques described in ¶¶26-45 *supra*) to health information, including his weight, medical history, and treatment goals. This medical information was captured through the Northbeam tracking code's interception of form submissions, quiz responses, page views revealing medical conditions, and

click events recorded during his interaction with the joinfridays.com medical intake process, as described above. This profile continues to be updated each time Plaintiff visits any website in Northbeam's network of 1,400+ tracked domains—including e-commerce, health and wellness, and other consumer websites—with each new interaction added to his permanent surveillance record. Plaintiff has no means of accessing, correcting, or deleting his Device Graph profile, and Northbeam provides no mechanism for consumers to opt out of its identity resolution system.

97.    The health information Northbeam transmitted to third parties through Northbeam Apex cannot be recalled or deleted by Northbeam. Once Plaintiff's health data entered these advertising platforms' systems, it became incorporated into their user profiles, algorithmic models, and targeting databases. Because Northbeam has already transmitted Plaintiff's data to Meta, TikTok, and other advertising platforms through Northbeam Apex, the harm cannot be undone: even if Northbeam ceased operations or Plaintiff deleted his account with joinfridays.com, the advertising platforms would retain Plaintiff's health information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about his health conditions.

98.    This ongoing harm—flowing directly from Northbeam's initial interception and disclosure—constitutes a continuing invasion of Plaintiff's privacy.

**B. Plaintiff Danielle Karamanian-Gleba**

99.    In or around December 2025, Plaintiff Karamanian-Gleba visited the website jonesroadbeauty.com to browse beauty and skincare products. Jones Road Beauty is a consumer cosmetics and skincare brand that sells its products through its direct-to-consumer e-commerce website.[30]

100.    While on the jonesroadbeauty.com website, Plaintiff Karamanian-Gleba completed a skincare quiz that required her to provide information about her skin type, skincare concerns, and product preferences, and entered her email address. Northbeam's tracking code was deployed and actively operating on the jonesroadbeauty.com website at the time of Plaintiff Karamanian-Gleba's visit and intercepted the contents of her communications with the website in real time. Specifically,

---

[30] *About*, Jones Road Beauty, https://www.jonesroadbeauty.com/pages/about (last visited April 27, 2026).

Northbeam's pixel captured Plaintiff Karamanian-Gleba's quiz responses—which revealed personal details such as her skin type, skincare concerns, and product preferences—her email address, and her browsing activity across the site, including pages viewed, products clicked, and time spent on each page.

101. Northbeam's Device Graph then used the intercepted data—including Plaintiff Karamanian-Gleba's email address, which served as a deterministic identifier—to identify Plaintiff Karamanian-Gleba and associate her quiz responses, browsing activity, and personal information with a persistent identity profile. Northbeam subsequently shared this information with advertising platforms including Meta and TikTok through Northbeam Apex, enabling those platforms to target advertisements to Plaintiff Karamanian-Gleba based on her skincare interests and browsing behavior.

102. As configured on the jonesroadbeauty.com website, the Northbeam tracking code captured user clicks and form submissions as the user submitted them. The pixel captured full-string URLs and clicks that corresponded to her skincare interests and browsing behavior, including her progress through the skincare quiz, pages visited, and products viewed.

103. At no time did Plaintiff Karamanian-Gleba consent to Northbeam intercepting her communications with jonesroadbeauty.com. Plaintiff Karamanian-Gleba did not have a direct relationship with Northbeam and was unaware of Northbeam's presence on the jonesroadbeauty.com website. Analysis of the jonesroadbeauty.com website confirms the presence and active operation of Northbeam's tracking infrastructure. When users interact with the jonesroadbeauty.com website, the pixel transmits tracking data to a collector endpoint at a first-party subdomain configured to route tracking data through Northbeam's servers while appearing as a first-party connection to the user's browser. Each tracking request transmitted from jonesroadbeauty.com to Northbeam's collector contains the user's persistent Device Graph identifier in the "duid" parameter, session identifier in the "sid" parameter, cumulative visit count in the "vid" parameter, and the full URL being visited—including URL paths and query parameters that reveal the user's browsing activity and product interests. The Northbeam tracking code on jonesroadbeauty.com sets a persistent cookie named "nb_sp_cookie" with a two-year expiration period, storing the user's

Device Graph identifier and enabling Northbeam to recognize and track returning visitors across extended time periods and multiple browsing sessions.

104. The jonesroadbeauty.com privacy policy and terms and conditions did not identify Northbeam as a recipient of user data or disclose that a third-party marketing intelligence company was independently intercepting and profiling users' personal information. Moreover, Northbeam's first-party subdomain configuration caused its tracking to bypass third-party cookie blockers and browser privacy protections that Plaintiff Karamanian-Gleba may have employed, and Northbeam does not respond to "Do Not Track" browser signals.[31] Plaintiff Karamanian-Gleba therefore had no means of discovering or preventing Northbeam's interception of her communications, and at no time did Plaintiff Karamanian-Gleba consent to Northbeam using her personal information for marketing attribution, identity resolution, or sharing with third-party advertising platforms through Northbeam Apex or any other means.

105. The privacy violations Plaintiff Karamanian-Gleba suffered are not confined to her visits to jonesroadbeauty.com but continue to the present day. Northbeam's Device Graph retains her identity profile, which remains linked (through the deterministic and probabilistic matching techniques described in ¶¶ 26–45 *supra*) to her personal information, skincare interests, quiz responses, and browsing activity. This profile continues to be updated each time Plaintiff Karamanian-Gleba visits any website in Northbeam's network of 1,400+ tracked domains— including e-commerce, health and wellness, and other consumer websites—with each new interaction added to her permanent surveillance record. Plaintiff Karamanian-Gleba has no means of accessing, correcting, or deleting her Device Graph profile, and Northbeam provides no mechanism for consumers to opt out of its identity resolution system.

106. The personal information Northbeam transmitted to third parties through Northbeam Apex cannot be recalled or deleted by Northbeam. Once Plaintiff Karamanian-Gleba's data entered these advertising platforms' systems, it became incorporated into their user profiles, algorithmic models, and targeting databases. Because Northbeam has already transmitted Plaintiff Karamanian-

---

[31] *Privacy Policy*, *supra* n. 13.

Gleba's data to Meta, TikTok, and other advertising platforms through Northbeam Apex, the harm cannot be undone. Even if Northbeam ceased operations or Plaintiff Karamanian-Gleba deleted her account with jonesroadbeauty.com, the advertising platforms would retain her personal information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about her consumer behavior and personal characteristics.

107. This ongoing harm—flowing directly from Northbeam's initial interception and disclosure—constitutes a continuing invasion of Plaintiff Karamanian-Gleba's privacy. Because Northbeam's Device Graph links user activity across its entire network of over 1,400 websites, any visit by Plaintiff Karamanian-Gleba to any other website where Northbeam's tracking code is deployed would have been captured and appended to her persistent identity profile, enriching Northbeam's surveillance record of her browsing behavior, purchasing activity, and personal characteristics without her knowledge or consent.

**C. Plaintiff Nicole Dantzic**

108. Beginning in approximately 2024 and as recently as May 2025, Plaintiff Dantzic visited the website glossier.com to browse and purchase beauty and skincare products. Glossier, Inc. is a consumer beauty and skincare brand that sells its products through its direct-to-consumer e-commerce website.[32]

109. While on the glossier.com website, Plaintiff Dantzic created a user account and entered personal information including her name, mailing address, and credit card information, and completed a purchase on the site. Northbeam's tracking code was deployed and actively operating on the glossier.com website at the time of Plaintiff Dantzic's visits and intercepted the contents of her communications with the website in real time, including her personal identifying information, account creation details, browsing activity, form inputs, and purchase and transaction details including items purchased, transaction amounts, and conversion events. As configured on the glossier.com website, the Northbeam tracking code captured user clicks and form submissions as the user submitted them. The pixel captured full-string URLs and clicks that corresponded to her

---

[32] *About*, Glossier, https://www.glossier.com/pages/about (last visited April 27, 2026).

browsing and purchasing behavior, including pages visited, products viewed, and her progress through the account creation and checkout process. The Northbeam tracking code captured the timing and substance of each purchase, enabling Northbeam to associate Plaintiff Dantzic's purchasing behavior with her persistent identity profile.

110. Northbeam's Device Graph then used the intercepted data to identify Plaintiff Dantzic and associate this personal information with a persistent identity profile. Northbeam subsequently shared this information with advertising platforms including Meta and TikTok through Northbeam Apex, enabling those platforms to target advertisements to Plaintiff Dantzic based on her browsing and purchasing behavior.

111. Analysis of the glossier.com website confirms the presence and active operation of Northbeam's tracking infrastructure. When users interact with the glossier.com website, the pixel transmits tracking data to a collector endpoint at a first-party subdomain configured to route tracking data through Northbeam's servers while appearing as a first-party connection to the user's browser. Each tracking request transmitted from glossier.com to Northbeam's collector contains the user's persistent Device Graph identifier in the "duid" parameter, session identifier in the "sid" parameter, cumulative visit count in the "vid" parameter, and the full URL being visited—including URL paths and query parameters that reveal the user's browsing and purchasing activity. The Northbeam tracking code on glossier.com sets a persistent cookie named "nb_sp_cookie" with a two-year expiration period, storing the user's Device Graph identifier and enabling Northbeam to recognize and track returning visitors across extended time periods and multiple browsing sessions.

112. At no time did Plaintiff Dantzic consent to Northbeam intercepting her communications with glossier.com. Plaintiff Dantzic did not have a direct relationship with Northbeam and was unaware of Northbeam's presence on the glossier.com website. The glossier.com privacy policy did not identify Northbeam as a recipient of user data or disclose that a third-party marketing intelligence company was independently intercepting and profiling users' personal information. Moreover, Northbeam's first-party subdomain configuration caused its tracking to bypass third-party cookie blockers and browser privacy protections that Plaintiff Dantzic

may have employed, and Northbeam does not respond to "Do Not Track" browser signals.[33] Plaintiff Dantzic therefore had no means of discovering or preventing Northbeam's interception of her communications, and at no time did Plaintiff Dantzic consent to Northbeam using her personal information for marketing attribution, identity resolution, or sharing with third-party advertising platforms through Northbeam Apex or any other means.

113. The privacy violations Plaintiff Dantzic suffered are not confined to her visits to glossier.com but continue to the present day. Northbeam's Device Graph retains her identity profile, which remains linked (through the deterministic and probabilistic matching techniques described in ¶¶ 26–45 *supra*) to her personal information, browsing activity, account details, and purchasing history. This profile continues to be updated each time Plaintiff Dantzic visits any website in Northbeam's network of 1,400+ tracked domains—including e-commerce, health and wellness, and other consumer websites—with each new interaction added to her permanent surveillance record. Plaintiff Dantzic has no means of accessing, correcting, or deleting her Device Graph profile, and Northbeam provides no mechanism for consumers to opt out of its identity resolution system.

114. The personal information Northbeam transmitted to third parties through Northbeam Apex cannot be recalled or deleted by Northbeam. Once Plaintiff Dantzic's data entered these advertising platforms' systems, it became incorporated into their user profiles, algorithmic models, and targeting databases. Because Northbeam has already transmitted Plaintiff Dantzic's data to Meta, TikTok, and other advertising platforms through Northbeam Apex, the harm cannot be undone: even if Northbeam ceased operations or Plaintiff Dantzic deleted her account with glossier.com, the advertising platforms would retain her personal information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about her consumer behavior and personal characteristics.

115. This ongoing harm—flowing directly from Northbeam's initial interception and disclosure—constitutes a continuing invasion of Plaintiff Dantzic's privacy. Because Northbeam's Device Graph links user activity across its entire network of over 1,400 websites, any visit by

---

[33] *Privacy Policy*, *supra* n. 13.

Plaintiff Dantzic to any other website where Northbeam's tracking code is deployed would have been captured and appended to her persistent identity profile, enriching Northbeam's surveillance record of her browsing behavior, purchasing activity, and personal characteristics without her knowledge or consent.

## V. CLASS ALLEGATIONS

116. Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes (collectively. the "Classes," each the "Class"):

**Nationwide Class:**

All natural persons located in the United States whose electronic communications with websites were intercepted by Northbeam's tracking code and whose identities were captured by Northbeam.

**California Sub-Class:**

All natural persons residing in California whose electronic communications with websites were intercepted by Northbeam's tracking code and whose identities were captured by Northbeam.

117. Excluded from the Classes are the following individuals: officers and directors of Northbeam and its parents, subsidiaries, affiliates, and any entity in which Northbeam has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

118. Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

119. This action readily satisfies the requirements of Federal Rule of Civil Procedure 23:

a. Each Class is so numerous that joinder of all members is impracticable. Upon information and belief, Class members number in the millions.

b. There are questions of law or fact common to the Classes, including: (1) whether Northbeam's tracking code intercepts the contents of electronic communications; (2) whether Northbeam's Device Graph constitutes identity resolution technology; (3) whether Northbeam's practices constitute an invasion of privacy; (4) whether Northbeam was unjustly enriched; and (5) whether injunctive relief should issue.

c. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs and Class members did not consent to Northbeam's interception and collection of their communications and personal information.

d. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with the interests of Class members, and Plaintiffs have retained competent counsel experienced in class action and privacy litigation.

e. Northbeam has acted on grounds generally applicable to the Classes, making final injunctive relief and declaratory relief appropriate with respect to the Classes as a whole.

## VI. TOLLING, CONCEALMENT, AND ESTOPPEL

120. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

121. Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of its conduct and operation.

122. The circumstances and nature of Northbeam's data collection would lead reasonable users to believe that Northbeam was not collecting their information or that website operators were not facilitating disclosure of the same.

123. Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

124. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

125. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

126. Accordingly, Plaintiffs and the class members could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**INVASION OF PRIVACY**
**Cal. Const. Art. 1 § 1**
**_(On Behalf of the California  Sub-Class)_**

127. Plaintiff John Avots-Amoth brings this claim on behalf of the Caifornia Sub-Class.

128. Plaintiff Avots-Smith incorporate by reference all preceding paragraphs.

129. Article I, Section 1 of the California Constitution provides that all people have inalienable rights including the right to privacy. This constitutional privacy right was added by voters in 1972 specifically to address concerns about "the increasing encroachment on personal freedom and security caused by increasing surveillance and data collection activity."

130. Plaintiff Avots-Smith and the California Sub-Class members maintain a reasonable expectation of privacy in their electronic communications with websites, including communications containing their sensitive personal, financial, and health information. This expectation of privacy is particularly strong with respect to information that consumers intend to share only with the website they are visiting, such as health information, credit card details, and personal identifying information.

131. Northbeam, in violation of Plaintiff Avots-Smith's and the California Sub-Class members' reasonable expectation of privacy, intercepts, collects, tracks, and compiles their internet activity and communications, and uses its Device Graph to resolve their identities and create persistent surveillance profiles without their consent.

132. Northbeam's conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms. Northbeam secretly intercepts sensitive communications—including personal, financial, and health information—that individuals reasonably expect to remain confidential between themselves and the websites they are visiting, then uses sophisticated technology to identify those individuals and track them across the internet.

133. Plaintiff Avots-Smith and the California Sub-Class members have been damaged by Northbeam's invasion of their privacy and are entitled to just compensation and injunctive relief.

## SECOND CAUSE OF ACTION

### INTRUSION UPON SECLUSION
*(On Behalf of the Nationwide Class, or in the alternative on behalf of the California Sub-Class)*

134. Plaintiffs incorporate by reference all preceding paragraphs.

135. To state a claim for intrusion upon seclusion under California common law, a plaintiff must allege (1) intrusion into a private place, conversation, or matter, and (2) in a manner highly offensive to a reasonable person.

136. Plaintiffs and Class members had an objectively reasonable expectation of privacy in their electronic communications with the websites they visited—including communications containing their personal identifying information, financial information, purchase histories, browsing activity, form submissions, and, in the case of telehealth and other sensitive websites, health information and treatment-seeking activity. Consumers reasonably expect that the contents of their communications with a website remain between themselves and that website, and that an undisclosed third-party marketing intelligence company is not silently intercepting, recording, and profiling those communications in real time.

137. Northbeam intentionally intruded upon Plaintiffs' and Class members' private affairs by deploying tracking code that, while configured to appear as a first-party connection, secretly intercepted the contents of their communications with the websites they visited, identified them through Northbeam's Device Graph, and compiled persistent surveillance profiles linking their activity across Northbeam's network of more than 1,400 websites. Northbeam's first-party subdomain configuration was specifically designed to evade browser privacy protections, third-party cookie blockers, and ad blockers, and Northbeam does not honor "Do Not Track" browser signals—ensuring that Plaintiffs and Class members had no practical means of detecting or preventing the intrusion.

138. Northbeam's intrusion was highly offensive to a reasonable person and constitutes an egregious breach of social norms. Northbeam covertly intercepted sensitive personal, financial, and health information that Plaintiffs and Class members reasonably

expected to share only with the websites they were visiting, and disguised itself as a first-party service to defeat the privacy controls those consumers attempted to employ. Northbeam then exploited that intercepted information for its own commercial benefit and disclosed it to advertising platforms through Northbeam Apex, compounding the intrusion.

139.   At no time did Plaintiffs or Class members consent to Northbeam's interception of their communications, identification through Northbeam's Device Graph, or disclosure of their information to advertising platforms.

140.   As a direct and proximate result of Northbeam's intrusion, Plaintiffs and Class members have suffered injury, including loss of privacy, loss of control over their personal information, and the continuing harm of having their personal information disclosed to and retained by third-party advertising platforms in a manner that cannot be undone.

141.   Plaintiffs and Class members are entitled to damages, including nominal, compensatory, and punitive damages, as well as injunctive and declaratory relief.

### THIRD CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
***(On Behalf of the Nationwide Class, or in the alternative on behalf of the California Sub-Class)***

142.   Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

143.   Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Northbeam, or alternatively on behalf of the California Sub-Class.

144.   The California Invasion of Privacy Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. Cal. Penal Code § 631(a).

145. At all relevant times, Plaintiff Avots-Smith was physically located in California when accessing and using joinfridays.com to seek virtual healthcare services. Plaintiff Karamanian-Gleba was physically located in Massachusetts when accessing and using jonesroadbeauty.com. Plaintiff Dantzic was physically located in Missouri when accessing and using glossier.com.

146. Plaintiffs' communications with the websites at issue, including responses to screening questions, input of personal information, and interactions with the websites' interfaces, constitute "electronic communications" within the meaning of the CIPA.

147. Through its tracking code and Device Graph technology deployed on joinfridays.com, jonesroadbeauty.com, glossier.com, and other websites, Northbeam intentionally intercepted Plaintiffs' electronic communications in real-time as they were transmitted.

148. Northbeam's tracking code constitutes a device capable of intercepting electronic communications within the meaning of the CIPA, as it is specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

149. On information and belief, Northbeam's servers are located in California, and when they intercepted Plaintiffs' and Class members' communications, these interceptions were effected by electronic devices located in California and stored in servers located in California.

150. Northbeam's interception of Plaintiffs' and Class members' electronic communications was accomplished without their consent. Specifically:

a. Northbeam never obtained express consent from Class members before intercepting their communications;

b. Websites where Northbeam is present begin tracking users immediately, and some require users to submit personal or medical information through preliminary screening questions before they can create an account or review any privacy policies;

c. Northbeam's tracking and interception begin immediately upon visiting pages where it is present, before any opportunity for users to provide informed consent;

d. Northbeam never provided clear, conspicuous notice that users' electronic communications containing personal or medical information would be intercepted and transmitted to Northbeam's servers and shared with advertising platforms; and

e. Any purported consent was ineffective because Northbeam's interception began before consent could be obtained and because users were never informed of Northbeam's role in intercepting their communications.

151. The intercepted communications include highly sensitive personal information that Plaintiffs and Class members provided with reasonable expectations of privacy and confidentiality, including:

a. Responses to health screening questions;

b. Medical history and current health conditions;

c. Weight and body statistics;

d. Prescription medication information; and

e. Other personal and financial information including names, addresses, credit card details, and purchase history.

152. Northbeam's conduct was willful and intentional, as Northbeam deliberately deployed tracking technology knowing it would intercept users' electronic communications without proper consent.

153. As a direct and proximate result of Northbeam's violations of the CIPA, Plaintiffs and Class members have suffered injury, including invasion of privacy, loss of confidentiality of personal information, and violation of their statutory rights.

154. Plaintiffs continue to desire to use the internet for healthcare, e-commerce, and other purposes but have a reasonable fear that their electronic communications will continue to be intercepted by Northbeam without consent.

155. Under Cal. Penal Code § 637.2, Plaintiffs and Class members are entitled to:

a. $5,000 per violation;

b. Punitive damages;

c. Reasonable attorneys' fees and other litigation costs reasonably incurred; and

d. Such preliminary and other equitable or declaratory relief as may be appropriate.

156.   Unless enjoined by this Court, Northbeam will continue to intercept the electronic communications of Plaintiffs, Class members, and other website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 632**
***(On Behalf of the Nationwide Class or in the alternative on behalf of the California sub-Class)***

157.   Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

158.   Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Northbeam.

159.   California Penal Code Section 632(a) provides that "[e]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]"

160.   California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

161.   The communications between Plaintiffs and Class members and websites where sensitive data is transmitted, such as joinfridays.com, jonesroadbeauty.com, and glossier.com, constitute "confidential communications" within the meaning of Section 632(c) because: (a) they were made in the context of seeking confidential healthcare services or engaging in private consumer transactions involving sensitive personal and financial information; (b) users had a reasonable expectation that their communications with retail and healthcare websites—including personal identifying information, financial details, and health information, would remain confidential; (c) the

sensitive nature of the information communicated—including health information, credit card details, and personal identifying information—inherently indicates a desire for confidentiality; and (d) users were not informed that their communications would be recorded and shared with third parties like Northbeam.

162. Northbeam intentionally used an electronic recording device—specifically, its tracking code and Device Graph technology deployed on websites including joinfridays.com, jonesroadbeauty.com, and glossier.com—to eavesdrop upon and record these confidential communications.

163. Northbeam's tracking code constitutes an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

164. Northbeam intentionally deployed this recording technology on healthcare, e-commerce, and other consumer websites with full knowledge that it would capture and record users' confidential communications, including their personal information, financial details, and responses to sensitive screening questions.

165. Northbeam's recording of Plaintiffs' and Class members' communications was accomplished without the consent of all parties to the communication, specifically: (a) Plaintiffs and Class members never consented to having their confidential communications recorded by Northbeam; (b) Northbeam never obtained express consent before recording their communications; (c) Users were not informed that their communications would be recorded and transmitted to Northbeam's servers and then shared with advertising platforms including Meta, TikTok, and Pinterest through Northbeam Apex; (d) No clear, conspicuous notice was provided regarding the scope and nature of Northbeam's recording of confidential communications; and (e) The recording begins immediately upon accessing websites where the Northbeam tracking code is installed, before users had any opportunity to review privacy policies or provide informed consent.

166. Northbeam's conduct was undertaken intentionally and with knowledge that its tracking code would record confidential communications without proper consent from all parties.

167. The confidential communications that were unlawfully recorded include highly sensitive personal, financial, and health information that individuals provided with reasonable expectations of confidentiality.

168. As a direct and proximate result of Northbeam's violations of Section 632, Plaintiffs and Class members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive personal information.

169. Unless enjoined and restrained by this Court, Northbeam will continue to commit these violations. Plaintiffs and Class members have a reasonable fear that their confidential communications will continue to be unlawfully recorded by Northbeam.

170. Pursuant to California Penal Code Section 637.2, Plaintiffs and Class members are entitled to:

    a. A preliminary and permanent injunction prohibiting Northbeam from continuing its unlawful recording of confidential communications;

    b. Statutory damages of $5,000 per violation;

    c. Punitive damages for Northbeam's willful and egregious violations of privacy; and

    d. Such other relief as the Court deems proper.

171. Plaintiffs and Class members seek all available remedies under California Penal Code Section 632 and related provisions for Northbeam's unlawful recording of confidential communications.

## FIFTH CAUSE OF ACTION
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2510, et seq.
### *(On Behalf of Plaintiffs and the Nationwide Class)*

172. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

173. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Northbeam.

174. The ECPA protects both the sending and receipt of communications.

175. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

176.	A violation of the ECPA occurs where any person:

[I]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

177.	"Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

178.	"Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

179.	"Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

180.	Whenever Plaintiffs and Class members transmitted electronic communications to websites where Northbeam's tracking code was installed, Northbeam, through the tracking code it deployed on the website, contemporaneously and intentionally intercepted the contents of Plaintiffs' and Class members' electronic communications while those communications were in transmission, and redirected such contents to Northbeam's servers and subsequently to third parties through Northbeam Apex.

181.	Northbeam intentionally intercepted and used the contents of Plaintiffs' and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiffs' and Class members' communications by transmitting the contents to third parties for marketing analytics and behavioral targeting purposes.

182.    Plaintiffs and Class members did not authorize Northbeam to acquire the content of their communications for purposes of sharing the personal information contained therein with advertising platforms and other third parties.

183.    Northbeam intercepted Plaintiffs' and Class members' electronic communications without authorization or consent, knowing or having reason to know that the electronic communications contained personal information. The intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class members regarding their food and restaurant preferences, cookware shopping habits, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

184.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

185.    Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, HIPAA and other state wiretapping and data privacy laws, among others.

186.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

187. As a direct and proximate result of Northbeam's violation of the ECPA, Plaintiffs and Class members were damaged by Northbeam's conduct in that:

a. Northbeam harmed Plaintiffs' and Class members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer confidential;

c. Northbeam took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value; and

d. Northbeam's actions diminished the value of Plaintiffs' and Class members' personal information.

188. Plaintiffs, individually and on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
#### (On Behalf of the Nationwide Class)

189. Plaintiffs incorporate by reference all preceding paragraphs.

190. Northbeam has wrongfully and unlawfully intercepted and used Plaintiffs' and Class members' personal information, including sensitive health information, for commercial gain without consent.

191. Plaintiffs and Class members conferred a benefit upon Defendant by providing valuable information, including purchase histories, browsing histories, sensitive health data, medical histories, and personal identifiers, through their use of websites where Northbeam is active.

192. Plaintiffs' and Class members' personal information has conferred an economic benefit on Northbeam. Northbeam has profited by using intercepted data in its Device Graph and by sharing identity-resolved consumer profiles with advertising platforms through Northbeam Apex.

193. It would be inequitable and unjust for Northbeam to retain any proceeds from its unlawful conduct. Plaintiffs and Class members are entitled to restitution and disgorgement of all

revenues, earnings, profits, and other benefits obtained by Northbeam as a result of its unlawful conduct.

### VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs John Avots-Smith, Danielle Karamanian-Gleba, and Nicole Dantzic, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Northbeam, Inc. and in favor of Plaintiffs and the Classes, and grant the following relief:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Appoint Plaintiffs as Class Representatives;

C. Appoint undersigned counsel as Class Counsel;

D. Enter judgment in favor of Plaintiffs and Class members against Northbeam awarding damages, including statutory damages, punitive damages, and nominal damages;

E. Enter judgment in favor of Plaintiffs and Class members awarding restitution and disgorgement of Northbeam's revenue obtained through unlawful tracking;

F. Enter a declaratory judgment that Northbeam's conduct violates the laws alleged herein;

G. Permanently restrain Northbeam from intercepting, tracking, collecting, or compiling the personal information of Plaintiffs and Class members without consent;

H. Award Plaintiffs and Class members their reasonable costs and expenses, including attorneys' fees;

I. Grant such other and further relief as the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 1, 2026

Respectfully Submitted,

/s/   Victor J. Sandoval

Victor J. Sandoval (SBN 344461)
*Lucas Coughlin
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd., Suite 1121
Los Angeles, California 90034
Telephone: (562) 534-5907
Email: victor@almeidalawgroup.com
Email: luke@almeidalawgroup.com
**pro hac vice* application forthcoming
*Attorneys for Plaintiffs & the Putative Classes*